## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMANDA DIGREGORY, | ) | Civil Action No. |
| | ) | |
| *Plaintiff,* | ) | Filed Electronically |
| | ) | |
| vs. | ) | |
| | ) | |
| U.S. HOUSE OF REPRESENTATIVES, | ) | |
| OFFICE OF CONGRESSMAN CHRIS | ) | |
| DELUZIO, | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Amanda DiGregory, by and through the undersigned counsel, files the

following

## THE PARTIES

1.      Plaintiff Amanda DiGregory is an adult individual residing at 2639 Brighton

Road, Pittsburgh, Pennsylvania 15212.

2.      Defendant U.S. House of Representatives, Office of Congressman Chris Deluzio,

is a personal office representing Pennsylvania's 17th District and an employing office under 2

U.S.C. §1301(a)(9)(A). Plaintiff is a covered employee under 2 U.S.C. §1301(a)(3)(A) and

§1301(a)(7). She was employed as Constituent Services Representative from May 15, 2023, at

$59,000 per year, until termination on July 3, 2025.

## JURISDICTION AND VENUE

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims arising under federal

statutes adopted and made applicable to congressional employing offices by the Congressional

Accountability Act of 1995, as amended, 2 U.S.C. § 1301 et seq. (the "CAA").

4.      Specifically, Plaintiff advances claims under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA"), as incorporated and applied to covered employees of the legislative branch through 2 U.S.C. § 1312. Section 1312 of the CAA provides that "the rights and protections established under sections 101 through 105, 106(a), 106(b), and 106(c) of the Family and Medical Leave Act of 1993 (29 U.S.C. 2611 through 2615, 2616(a), 2616(b), and 2616(c)) shall apply to covered employees."

5.      Plaintiff also advances claims under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as incorporated and applied to covered employees of the legislative branch through 2 U.S.C. § 1311(a)(3). Section 1311(a)(3) of the CAA provides that "the rights and protections against employment discrimination on the basis of disability established by sections 102 through 104 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112 through 12114) and sections 501 through 504 and 510 of the Rehabilitation Act of 1973 (29 U.S.C. 791 through 794 and 794f)" shall apply to covered employees.

6.      As Plaintiff's claims arise under federal law through the Congressional Accountability Act, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and Plaintiff's claims are properly before this Court (Plaintiff's claims arising under 2 U.S.C. §§ 1311 and 1312 are identified as the "Federal Law Claims").

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

7.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims occurred within this judicial district.

Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

8.      Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District. Defendant's congressional district office, where Plaintiff was employed as a Constituent Services Representative, is located in Allegheny County. All of the discriminatory, retaliatory, and unlawful conduct complained of herein occurred at this location and within Allegheny County during Plaintiff's employment with Defendant from May 15, 2023, through her termination on July 3, 2025.

9.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District pursuant to LCvR 3.

**C.     This Court May Exercise Personal Jurisdiction Over Defendant.**

10.     This Court may exercise personal jurisdiction over Defendant as Defendant is a federal employing office conducting operations within the Commonwealth of Pennsylvania and is subject to the jurisdiction of this Court for claims arising under federal law.

11.     Defendant maintains and operates a congressional district office in Allegheny County, Pennsylvania, within the Western District, where Plaintiff was employed and where all events giving rise to this action occurred. Accordingly, Defendant may properly be brought before this Court.

**D.     Plaintiff Has Exhausted Her Administrative Remedies; Her Federal Law Claims are Properly Before This Court.**

12.     Plaintiff has satisfied all procedural and administrative prerequisites under 2 U.S.C. §§ 1401-1408 and may now proceed to bring this action before the Court. The

Congressional Accountability Act establishes specific procedures and requirements that must be satisfied before a covered employee may file a civil action in federal court.

13.     Specifically, on October 17, 2025, Plaintiff timely filed a claim with the Office of Congressional Workplace Rights ("OCWR") alleging violations of the rights and protections provided under the Congressional Accountability Act. The claim was assigned case number 25-HS-44 (DA, FM).

14.     Pursuant to 2 U.S.C. § 1403(a) and the OCWR Procedural Rules, the Executive Director of OCWR transmitted Plaintiff's claim to Defendant. Due to a lapse in funding resulting in OCWR being closed, the first day of consideration for purposes of the Preliminary Review period was November 21, 2025.

15.     On November 26, 2025, Hearing Officer Saul Schwartz was appointed to conduct a preliminary review of Plaintiff's claims pursuant to section 4.08(a) of the OCWR Procedural Rules. On December 22, 2025, Hearing Officer Schwartz issued a Report on Preliminary Review (the "Preliminary Review Report") determining that Plaintiff is a covered employee who has stated claims for which, if the allegations are true, relief may be granted under the Congressional Accountability Act. The Preliminary Review Report concluded that Plaintiff may proceed with her disability discrimination and FMLA claims.

16.     Having satisfied all procedural prerequisites under the Congressional Accountability Act, Plaintiff's Federal Law Claims are properly before this Court.

## **FACTUAL BACKGROUND**

17.     Plaintiff commenced her employment with Defendant on or around May 15, 2023, in the position of Constituent Services Representative.

18.     In this position, Plaintiff was responsible for serving as a liaison between

constituents and federal agencies, assisting constituents with navigating federal bureaucracy, and providing general customer service for the congressional district.

19.     Plaintiff was a salaried employee earning $59,000 per year and performed her duties satisfactorily.

## Disability Disclosure and Accommodation Requests

20.     In the summer of 2024, Plaintiff formally notified Defendant that she suffered from several diagnosed health conditions, including generalized anxiety disorder, major depressive disorder, OCD, chronic PTSD, and ADHD (collectively, the "Disabilities").

21.     Plaintiff provided Defendant with supporting medical documentation regarding the Disabilities.

22.     Plaintiff requested reasonable accommodations to assist her in performing her job duties: specifically, permission to bring her prescribed therapy dog to work and a quieter workspace to mitigate the effects of her ADHD.

23.     District Director Caroline Lowe and an individual named Kathy initially approved Plaintiff's therapy dog accommodation.

24.     However, when Plaintiff attempted to bring the therapy dog to the office, Defendant revoked this accommodation without explanation or reason.

25.     Plaintiff's request for a quieter workspace was ignored entirely by Defendant.

26.     Despite denying Plaintiff's request for a quieter workspace, Defendant granted the exact same accommodation to a male colleague, District Communications Director Josh Sleetman, who also complained about noise in the office.

27.     Defendant never engaged in any interactive process with Plaintiff regarding her accommodation requests and never provided the reasonable accommodations Plaintiff requested.

**Deteriorating Work Conditions**

28.     By late 2024, Defendant's failure to provide any support or accommodation caused Plaintiff's health to deteriorate.

29.     Plaintiff faced a significant increase in her workload due to Defendant's office being understaffed.

30.     Plaintiff was effectively performing the work of three employees.

31.     Plaintiff made repeated requests for assistance and help from Defendant's management.

32.     Defendant's management ignored or dismissed Plaintiff's requests for help.

33.     The increased workload and lack of support exacerbated Plaintiff's Disabilities.

**Hostile Performance Review and FMLA Leave**

34.     On January 27, 2025, Plaintiff attended a performance review meeting with her Direct Supervisor Seron Cox, District Director Caroline Lowe, and Chief of Staff Matt Koos.

35.     Plaintiff's written performance review was satisfactory.

36.     Despite the satisfactory written review, the supervisors verbally berated Plaintiff during the meeting in a hostile manner.

37.     The supervisors "verbally annihilated" Plaintiff, criticizing her in a loud and relentless fashion.

38.     This hostile treatment caused Plaintiff visible distress and she began crying during the meeting.

39.     Plaintiff suffered a "full-blown panic attack" during the meeting.

40.     The panic attack was so severe that Plaintiff was forced to flee the room.

41.     The hostile performance review meeting caused a severe exacerbation of

Plaintiff's Disabilities.

42.    As a direct result of this conduct and the exacerbation of her Disabilities,

Plaintiff's physician directed her to take a leave of absence from work.

43.    Plaintiff took protected medical leave from approximately January 30, 2025,

through April 2, 2025.

44.    Plaintiff utilized her accrued paid time off for February 2025.

45.    Plaintiff then took leave under the Family and Medical Leave Act from March

2025 through April 2, 2025.

46.    Plaintiff returned to work from her FMLA leave in April 2025.

### Retaliatory Work Plan and Heightened Scrutiny

47.    Immediately upon her return from FMLA leave in April 2025, Defendant began a

clear and systematic campaign of retaliation against Plaintiff.

48.    Defendant presented Plaintiff with a restrictive "work plan" that required her to

show improvement in various areas that had never been raised as issues prior to her FMLA

leave.

49.    Defendant subjected Plaintiff to disparate and heightened scrutiny that was not

imposed on any other employee who had not taken FMLA leave or disclosed a disability.

50.    Specifically, Plaintiff was the only employee required to call District Director

Caroline Lowe every single morning between 9:00 a.m. and 9:05 a.m. to "check in."

51.    No other employees were subjected to this daily check-in requirement.

52.    On one occasion, Plaintiff missed a check-in call while working at a satellite

office without easy access to a phone.

53.    Following this missed check-in, Plaintiff's supervisor berated her in an aggressive

and unprofessional email.

54.    The supervisor copied Chief of Staff Matt Koos on this aggressive email, publicly reprimanding Plaintiff.

55.    This targeted scrutiny and disparate treatment was retaliatory in nature and designed to punish Plaintiff for taking FMLA leave and requesting accommodations for her Disabilities.

**Pretextual Termination**

56.    In June 2025, Plaintiff and four of her colleagues attended a caseworkers' conference in Washington, D.C.

57.    The conference was held at the Hyatt on Capitol Hill.

58.    On a Monday evening during the conference, a bomb threat was called into the conference hotel.

59.    As a result of the bomb threat, Plaintiff and her colleagues were forced to remain outside of the hotel until approximately 2:00 a.m.

60.    Plaintiff and her colleagues were deeply unsettled and traumatized by this event.

61.    The entire group of five employees, including Plaintiff, collectively decided to skip the conference session the following morning and return to the conference after lunch.

62.    All five employees made this decision together and all five employees skipped the morning session.

63.    On July 3, 2025, Defendant terminated Plaintiff's employment.

64.    Plaintiff was told that the termination was due to her missing the morning session of the conference.

65.    The four colleagues who made the exact same decision to miss the morning

session and who also skipped the morning session were not disciplined in any manner whatsoever.

66.    None of Plaintiff's colleagues who skipped the morning session were terminated.

67.    The disparate treatment demonstrates that the stated reason for Plaintiff's termination was pretextual.

68.    The real reason for Plaintiff's termination was retaliation for taking FMLA leave and requesting disability accommodations.

69.    The termination occurred just three months after Plaintiff's return from FMLA leave and followed the pattern of heightened scrutiny and retaliatory treatment that began immediately upon her return.

### Unemployment Determination

70.    Following her termination, Plaintiff applied for unemployment benefits with the Pennsylvania Department of Labor & Industry.

71.    The Pennsylvania Department of Labor & Industry determined that Plaintiff was eligible for unemployment benefits.

72.    Defendant did not dispute the unemployment determination with sufficient evidence, further supporting that the termination was without good cause.

### COUNT I
### FMLA INTERFERENCE
### 2 U.S.C. § 1312 incorporating 29 U.S.C. § 2612 *et seq.*

73.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

74.    The Congressional Accountability Act of 1995, as amended, 2 U.S.C. § 1312, provides that "the rights and protections established under sections 101 through 105, 106(a),

106(b), and 106(c) of the Family and Medical Leave Act of 1993 (29 U.S.C. 2611 through 2615, 2616(a), 2616(b), and 2616(c)) shall apply to covered employees."

75.     The FMLA provides that an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

76.     The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

77.     To establish an FMLA interference claim, a plaintiff must show: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA. *Janovsky v. UPMC Presbyterian*, Civil Action No. 21-615, 2023 U.S. Dist. LEXIS 134790, at *12 (W.D. Pa. Aug. 3, 2023).

78.     Plaintiff was an eligible employee entitled to take FMLA leave for a serious health condition under 29 U.S.C. § 2612(a)(1)(D).

79.     Defendant is an employer subject to the FMLA's requirements pursuant to 29 U.S.C. § 2611(4)(A)(iii) as it is the office of a Member of the House of Representatives.

80.     Following the hostile performance review of January 27, 2025, which caused Plaintiff to suffer a severe panic attack and exacerbation of her Disabilities, Plaintiff's physician directed her to take a leave of absence from work.

81.     The mandated course of action was communicated to the Defendant.

82.    Plaintiff took protected FMLA leave from March 2025 through April 2, 2025, for a serious health condition that made her unable to perform the functions of her position.

83.    Plaintiff was entitled to take this FMLA leave and to return to her position following the conclusion of her leave period.

84.    Defendant interfered with Plaintiff's FMLA rights by subjecting her to adverse treatment immediately upon her return from protected leave in April 2025.

85.    Specifically, Defendant interfered with Plaintiff's FMLA rights by: (a) imposing a restrictive "work plan" that required her to show improvement in areas never previously raised as deficient; (b) subjecting her to heightened scrutiny and monitoring not imposed on any other employee, including requiring daily check-in calls between 9:00 a.m. and 9:05 a.m.; (c) berating her via email when she missed a check-in while working at a satellite office; and (d) ultimately terminating her employment just three months after her return from FMLA leave.

86.    These actions interfered with Plaintiff's right to take FMLA leave and her right to return to her position without being subjected to adverse treatment because she exercised her FMLA rights.

87.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations

of the FMLA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) statutory penalties as provided by law; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and post-judgment interest as calculated by law; and (vi) any further legal and equitable relief as this Court may deem just and proper.

**COUNT II**
**FMLA RETALIATION**
**2 U.S.C. § 1312 incorporating 29 U.S.C. § 2615**

88.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

89.     The FMLA prohibits employers from discriminating or retaliating against an employee for exercising rights protected under the Act. 29 U.S.C. § 2615(a)(2).

90.     Specifically, the FMLA makes it unlawful for any employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

91.     To establish an FMLA retaliation claim, a plaintiff must show: (1) she invoked her right to FMLA-protected leave; (2) she suffered an adverse employment decision; and (3) the adverse action was causally related to her invocation of FMLA rights. *Janovsky v. UPMC Presbyterian*, Civil Action No. 21-615, 2023 U.S. Dist. LEXIS 134790, at *16 (W.D. Pa. Aug. 3, 2023).

92.     Plaintiff engaged in protected activity by taking FMLA leave from March 2025 through April 2, 2025, for a serious health condition.

93.     Immediately upon her return from FMLA leave in April 2025, Defendant subjected Plaintiff to a series of adverse employment actions.

94.     First, Defendant imposed a restrictive "work plan" upon Plaintiff requiring her to demonstrate improvement in areas that had never been raised as deficiencies during her satisfactory performance prior to taking FMLA leave.

95.     Second, Defendant subjected Plaintiff to disparate and heightened scrutiny not imposed on any employee who had not taken FMLA leave or disclosed a disability, including requiring Plaintiff alone to call District Director Caroline Lowe every morning between 9:00 a.m. and 9:05 a.m. to check in.

96.     Third, when Plaintiff missed one check-in call while working at a satellite office without easy access to a phone, Defendant's supervisor berated her via an aggressive email with the Chief of Staff copied, publicly reprimanding Plaintiff in a manner not applied to other employees.

97.     Fourth, on July 3, 2025, just three months after Plaintiff's return from FMLA leave, Defendant terminated Plaintiff's employment.

98.     Defendant told Plaintiff that the termination was due to her missing a morning session at a conference following a bomb threat that forced her and her colleagues outside until 2:00 a.m.

99.     However, the four colleagues who made the exact same decision to miss the morning session and who also skipped the session were not disciplined in any manner whatsoever.

100.    The temporal proximity between Plaintiff's return from FMLA leave in April 2025 and her termination on July 3, 2025, is evidence of a causal connection between the

protected activity and the adverse action.

101.    The disparate treatment—wherein Plaintiff was terminated for conduct for which her colleagues received no discipline—demonstrates that the stated reason for termination was pretextual and that the real reason was retaliation for taking FMLA leave.

102.    The pattern of adverse actions beginning immediately upon Plaintiff's return from FMLA leave and culminating in her termination demonstrates a clear causal link between her exercise of FMLA rights and the adverse employment actions.

103.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations of the FMLA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) statutory penalties as provided by law; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and post-judgment interest as calculated by law; and (vi) any further legal and equitable relief as this Court may deem just and proper.

### COUNT III
### DISABILITY DISCRIMINATION UNDER ADA
### 2 U.S.C. § 1311(a)(3) incorporating 42 U.S.C. § 12101 *et seq.* and 29 U.S.C. § 701 *et seq.*

104.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

105.     The Congressional Accountability Act of 1995, as amended, 2 U.S.C. § 1311(a)(3), provides that "the rights and protections against employment discrimination on the basis of disability established by sections 102 through 104 of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12112 through 12114) and sections 501 through 504 and 510 of the Rehabilitation Act of 1973 (29 U.S.C. §§ 791 through 794 and 794f)" shall apply to covered employees.

106.     The ADA defines the term "disability" as: "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having an impairment." 42 U.S.C. § 12102(1).

107.     The ADA further defines the term "major life activities" to include, in pertinent part, "caring for oneself," "performing manual tasks," "seeing," "hearing," "eating," "sleeping," "walking," "standing," "lifting," "bending," "speaking," "breathing," "learning," "reading," "concentrating," "thinking," "communicating," and "working," as well as the "operation of a major bodily function, including ... brain [and] neurological functions." 42 U.S.C. § 12102(2).

108.     To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations by the employer; and (3) she suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Techs*, 134, F.3d 576, 580 (3d Cir. 1998).

**A.      Plaintiff is a "Disabled Person" Pursuant to 42 U.S.C. § 12102 of the ADA.**

109.     Plaintiff suffers from generalized anxiety disorder, major depressive disorder, OCD, chronic PTSD, and ADHD.

110.     These conditions are mental impairments that substantially limit one or more of Plaintiff's major life activities, including but not limited to concentrating, thinking, communicating, working, and the operation of major bodily functions including brain and neurological functions.

111.     Specifically, Plaintiff's Disabilities cause her to experience severe panic attacks, increased stress and anxiety levels, difficulty concentrating, and other medical maladies.

112.     These symptoms substantially limit Plaintiff's major life activities and qualify as disabilities pursuant to 42 U.S.C. § 12102.

113.     In the summer of 2024, Plaintiff formally notified Defendant of her Disabilities and provided supporting medical documentation.

114.     Accordingly, Plaintiff possessed a "disability" under the meaning of the ADA and was correspondingly "disabled" for purposes of establishing her *prima facie* case.

**B.      Plaintiff is a Qualified Individual Pursuant to 42 U.S.C. § 12111 of the ADA and Was Qualified to Perform the Essential Duties of Her Job.**

115.     The ADA provides that a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

116.     Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her role as Constituent Services Representative.

117.     Specifically, Plaintiff was sufficiently skilled in serving as a liaison between constituents and federal agencies, assisting constituents with navigating federal bureaucracy, and

providing general customer service for the congressional district.

118.    At all times material, Plaintiff was qualified to perform the essential duties of her position.

119.    Indeed, Plaintiff's written performance review dated January 27, 2025, was satisfactory, demonstrating her ability to perform the essential functions of her position.

120.    Plaintiff performed her duties satisfactorily from the time she commenced employment with Defendant on May 15, 2023, through her termination on July 3, 2025.

**C.    Plaintiff Suffered Adverse Employment Actions Because of Her Disability.**

121.    Defendant had actual knowledge of Plaintiff's Disabilities from the summer of 2024 when Plaintiff formally disclosed her multiple diagnosed conditions and provided supporting medical documentation.

122.    Despite this knowledge, Defendant discriminated against Plaintiff because of her Disabilities.

123.    Specifically, Defendant initially approved Plaintiff's request to bring her prescribed therapy dog to work as a reasonable accommodation, but then inexplicably revoked this accommodation without explanation when Plaintiff attempted to bring the dog to the office.

124.    Defendant completely ignored Plaintiff's request for a quieter workspace to accommodate her ADHD, despite the fact that such an accommodation was reasonable and necessary.

125.    Meanwhile, Defendant granted the exact same quieter workspace accommodation to a male colleague, District Communications Director Josh Sleetman, who also complained about noise in the office, demonstrating disparate treatment based on disability.

126.    By late 2024, Defendant's failure to provide any support or accommodation for Plaintiff's Disabilities, combined with a significant increase in her workload, caused Plaintiff's

health to deteriorate.

127.    On January 27, 2025, Defendant's supervisors subjected Plaintiff to a hostile

performance review wherein they verbally berated her despite her written review being

satisfactory, causing Plaintiff to suffer a full-blown panic attack and forcing her to flee the room.

128.    Defendant's conduct during this performance review was severe and tangible

enough to affect Plaintiff's terms, conditions, and privileges of employment.

129.    Following Plaintiff's return from medical leave in April 2025, Defendant

subjected Plaintiff to a heightened level of scrutiny and disparate treatment not imposed on

employees without disabilities.

130.    Defendant imposed a restrictive work plan upon Plaintiff and required her alone

to make daily check-in calls, treating her differently than similarly situated employees without

disabilities.

131.    As a direct and proximate result of this discriminatory conduct, Plaintiff suffered

the ultimate adverse employment action when Defendant terminated her employment on July 3,

2025.

132.    The stated reason for termination—missing a conference session that four non-

disabled colleagues also missed without discipline—demonstrates that Defendant's actions were

motivated by Plaintiff's disability.

133.    As a direct and proximate result of Defendant's discriminatory conduct in

violation of the ADA, Plaintiff has suffered not only tangible economic loss in the form of lost

back pay and benefits and lost front pay and benefits, but also substantial emotional and physical

distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory

damages for these injuries, in addition to the tangible economic losses she suffered and will

continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (iv) pre-judgment and post-judgment interest as calculated by law; and (v) any further legal and equitable relief as this Court may deem just and proper.

### COUNT IV
### FAILURE TO PROVIDE REASONABLE ACCOMMODATION
### 2 U.S.C. § 1311(a)(3) incorporating 42 U.S.C. § 12101 *et seq.*

134.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

135.    The ADA requires employers to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

136.    To establish a failure to accommodate claim under the ADA, a plaintiff must show: (1) she was disabled, and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated." *Anderson v. Norfolk S. Ry. Co.*, No. 3:18-cv-00190, 2021 U.S. Dist. LEXIS 62517, at *25 (W.D. Pa. Mar. 31, 2021).

137.    As averred hereinabove, Plaintiff suffers from generalized anxiety disorder,

major depressive disorder, OCD, chronic PTSD, and ADHD, which are disabilities within the meaning of the ADA.

138.    In the summer of 2024, Plaintiff formally notified Defendant of her Disabilities and provided supporting medical documentation, thereby giving Defendant actual notice of her disability.

139.    Plaintiff specifically requested reasonable accommodations to assist her in performing her job duties: permission to bring her prescribed therapy dog to work and a quieter workspace to mitigate the effects of her ADHD.

140.    These accommodations were reasonable as they would allow Plaintiff to perform the essential functions of her position and would not impose an undue hardship on Defendant.

141.    Indeed, the therapy dog accommodation was initially approved by District Director Caroline Lowe and another supervisor, demonstrating its reasonableness.

142.    Similarly, the quieter workspace accommodation was demonstrated to be reasonable when Defendant granted this exact accommodation to District Communications Director Josh Sleetman.

143.    Despite initially approving the therapy dog accommodation, Defendant revoked this accommodation without explanation when Plaintiff attempted to bring the dog to the office.

144.    Defendant completely failed to provide the quieter workspace accommodation, ignoring Plaintiff's request entirely.

145.    The fact that Defendant provided the quieter workspace accommodation to a male colleague but denied it to Plaintiff demonstrates that the accommodation was reasonable and that Defendant's failure to provide it to Plaintiff was discriminatory.

146.    As a direct result of Defendant's failure to provide these reasonable

accommodations, Plaintiff's Disabilities were exacerbated, her work conditions deteriorated, and she ultimately suffered termination from her employment.

147.    Defendant's failure to provide reasonable accommodations caused Plaintiff harm in the form of worsening medical conditions, hostile work environment, and loss of employment.

148.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (iv) pre-judgment and post-judgment interest as calculated by law; and (v) any further legal and equitable relief as this Court may deem just and proper.

### COUNT V
### FAILURE TO ENGAGE IN INTERACTIVE PROCESS
### 2 U.S.C. § 1311(a)(3) incorporating 42 U.S.C. § 12101 *et seq.*

149.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

150.    The ADA requires employers to engage in an interactive process with employees to determine appropriate reasonable accommodations. *Blanchetti v. Greensburg Salem Sch.*

*Dist.*, Civil Action No. 2:25-88, 2025 U.S. Dist. LEXIS 150171, at *9 (W.D. Pa. Aug. 5, 2025)

151.     The interactive process is a mandatory, good-faith exchange between employer and employee to explore what accommodations might enable the employee to perform the essential functions of the job.

152.     An employer violates the ADA when it fails to engage in this required good-faith interactive process to determine appropriate accommodations.

153.     As averred hereinabove, Plaintiff disclosed her Disabilities to Defendant in the summer of 2024 and requested specific reasonable accommodations.

154.     Rather than engage in a meaningful interactive process to determine appropriate accommodations, Defendant took unilateral actions that demonstrated bad faith.

155.     Specifically, Defendant initially approved the therapy dog accommodation but then revoked it without any discussion with Plaintiff about alternatives or the reasons for the revocation.

156.     Defendant never engaged in any dialogue with Plaintiff regarding the quieter workspace accommodation, simply ignoring her request entirely.

157.     Defendant never explored alternative accommodations that might have addressed Plaintiff's needs while meeting Defendant's operational concerns.

158.     Defendant's complete failure to engage in any interactive process regarding the workspace accommodation, and its unilateral revocation of the therapy dog accommodation without discussion, demonstrates Defendant's bad faith and failure to comply with the ADA's requirements.

159.     Had Defendant engaged in the required good-faith interactive process, reasonable accommodations could have been identified and implemented that would have

allowed Plaintiff to continue performing her job successfully.

160.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (iv) pre-judgment and post-judgment interest as calculated by law; and (v) any further legal and equitable relief as this Court may deem just and proper.

### COUNT VI
### HOSTILE WORK ENVIRONMENT BASED ON DISABILITY
### 2 U.S.C. § 1311(a)(3) incorporating 42 U.S.C. § 12101 *et seq.*

161.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

162.    The ADA prohibits disability-based harassment that creates a hostile work environment. 42 U.S.C. § 12112(a).

163.    To establish a hostile work environment claim under the ADA, a plaintiff must show: (1) she is a member of a protected class (disabled); (2) she was subjected to unwelcome harassment because of her disability; (3) the harassment was severe or pervasive enough to alter

the conditions of employment and create an abusive working environment; and (4) the harassment is imputable to the employer. *Hair v. Fayette Cty. of Pa.*, 265 F. Supp. 3d 544, 561 (W.D. Pa. 2017).

164.    The "severe or pervasive" standard is measured through a totality of the circumstances including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

**A.    Plaintiff is a Member of a Protected Class.**

165.    As averred hereinabove, Plaintiff suffers from generalized anxiety disorder, major depressive disorder, OCD, chronic PTSD, and ADHD, which are disabilities within the meaning of the ADA.

166.    Accordingly, Plaintiff is a member of a protected class under the ADA.

**B.    Plaintiff Was Subjected to Unwelcome Harassment Because of Her Disability.**

167.    Following Plaintiff's disclosure of her Disabilities in the summer of 2024, Defendant subjected Plaintiff to harassment and hostile treatment because of her Disabilities.

168.    Defendant revoked Plaintiff's approved therapy dog accommodation after Plaintiff attempted to bring the dog to work, sending a clear message that her disability-related needs were unwelcome.

169.    Defendant ignored Plaintiff's request for a quieter workspace while granting the same accommodation to a non-disabled male colleague, demonstrating that Plaintiff was treated differently because of her disability.

170.    By late 2024, Defendant failed to provide any support for Plaintiff's Disabilities while significantly increasing her workload, causing her Disabilities to worsen.

171.    On January 27, 2025, Defendant's supervisors subjected Plaintiff to a hostile performance review wherein they verbally berated her in a loud and relentless manner despite her written review being satisfactory.

172.    This hostile treatment was directed at Plaintiff because of her Disabilities and was designed to punish her for requesting accommodations.

173.    The hostile performance review caused Plaintiff to suffer a full-blown panic attack during the meeting, forcing her to flee the room.

174.    Following Plaintiff's return from medical leave in April 2025, Defendant subjected Plaintiff to heightened and disparate scrutiny, including a restrictive work plan and daily check-in requirements not imposed on employees without disabilities.

175.    When Plaintiff missed one check-in call while working at a satellite office, Defendant's supervisor berated her via an aggressive email with the Chief of Staff copied, publicly humiliating Plaintiff.

176.    This pattern of harassment was unwelcome and was directed at Plaintiff because of her Disabilities.

## C.    The Harassment Was Severe or Pervasive Enough to Alter Conditions of Employment.

177.    At all times relevant hereto, the harassment Plaintiff experienced was both "severe" and "pervasive."

178.    The harassment began in the summer of 2024 when Defendant revoked the therapy dog accommodation and continued through Plaintiff's termination on July 3, 2025, spanning nearly one year.

179.    The harassment occurred with great frequency, including daily check-in requirements, constant heightened scrutiny, and repeated disparate treatment.

180.    The harassment was severe, including the hostile performance review that caused Plaintiff to suffer a panic attack, the aggressive email reprimand, and the ultimate termination based on pretextual reasons.

181.    The harassment was both physically and emotionally threatening and humiliating, causing Plaintiff to experience exacerbations of her Disabilities, including severe panic attacks.

182.    The harassment unreasonably interfered with Plaintiff's work performance by creating constant stress and anxiety about whether she would face additional discrimination or punishment for her disability.

183.    Viewed under the totality of the circumstances, the harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

**D.     The Harassment Is Imputable to the Employer.**

184.    All of the harassment described herein was perpetrated by Defendant's supervisors and management, including District Director Caroline Lowe, Direct Supervisor Seron Cox, and Chief of Staff Matt Koos.

185.    These individuals held supervisory authority over Plaintiff and acted within the scope of their employment in perpetrating the harassment.

186.    Defendant had actual knowledge of the harassment as it was carried out by its own supervisors and management team.

187.    Defendant took no remedial action to stop the harassment and instead escalated it by terminating Plaintiff's employment.

188.    Accordingly, the harassment is directly imputable to Defendant.

189.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (iv) pre-judgment and post-judgment interest as calculated by law; and (v) any further legal and equitable relief as this Court may deem just and proper.

## COUNT VII
### RETALIATION UNDER ADA
### 2 U.S.C. § 1311(a)(3) incorporating 42 U.S.C. § 12101 *et seq.*

190.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

191.    The ADA prohibits retaliation against individuals who have opposed any act or practice made unlawful by the ADA or who have requested accommodations under the ADA. 42 U.S.C. § 12203(a).

192.    To establish a retaliation claim under the ADA, a plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a

causal connection between the protected activity and the adverse action. *Mastronicola v.*

*Principi*, No. 2:04-cv-1655, 2006 U.S. Dist. LEXIS 78879, at *26 (W.D. Pa. Oct. 30, 2006).

193.    An adverse employment action is an action that is "serious and tangible enough

to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v.*

*Burns Int'l Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).

194.    A causal connection can be established through evidence of temporal proximity

between the protected activity and the adverse action, as well as evidence demonstrating that the

stated reason for the adverse action was pretextual.

**A.    Plaintiff Engaged in Protected Activity.**

195.    In the summer of 2024, Plaintiff engaged in protected activity by disclosing her

Disabilities to Defendant and requesting reasonable accommodations, specifically permission to

bring her prescribed therapy dog to work and a quieter workspace.

196.    Requesting disability accommodations is protected activity under the ADA.

197.    Plaintiff also engaged in protected activity by expressing frustration regarding

Defendant's failure to provide her with the reasonable accommodations she requested.

198.    Opposing disability discrimination is protected activity under the ADA.

**B.    Plaintiff Suffered Adverse Employment Actions.**

199.    Following Plaintiff's engagement in protected activity, Defendant subjected

Plaintiff to multiple adverse employment actions.

200.    Defendant revoked the therapy dog accommodation that had been approved,

sending a clear message that Plaintiff's requests for accommodations would be punished.

201.    Defendant subjected Plaintiff to a hostile performance review on January 27,

2025, wherein supervisors verbally berated her despite her satisfactory written review.

202.    Following Plaintiff's return from medical leave in April 2025, Defendant imposed a restrictive work plan upon Plaintiff and subjected her to disparate heightened scrutiny, including daily check-in requirements.

203.    Defendant publicly reprimanded Plaintiff via an aggressive email with the Chief of Staff copied when she missed one check-in call.

204.    On July 3, 2025, Defendant terminated Plaintiff's employment, the ultimate adverse employment action.

205.    These actions were serious and tangible enough to alter Plaintiff's compensation, terms, conditions, and privileges of employment.

## C.    There Was a Causal Connection Between the Protected Activity and the Adverse Actions.

206.    The temporal proximity between Plaintiff's accommodation requests in the summer of 2024 and the subsequent adverse actions demonstrates a causal connection.

207.    The revocation of the therapy dog accommodation occurred shortly after Plaintiff's formal disclosure of her Disabilities and accommodation requests.

208.    The hostile performance review occurred after Plaintiff had been requesting accommodations and expressing frustration with Defendant's failure to provide them.

209.    The restrictive work plan and heightened scrutiny began immediately upon Plaintiff's return from medical leave in April 2025.

210.    The termination occurred just three months after Plaintiff's return from medical leave and followed a clear pattern of retaliatory conduct.

211.    The stated reason for termination—missing a conference session—was pretextual, as evidenced by the fact that four colleagues who made the same decision were not disciplined.

212.    The disparate treatment demonstrates that the real reason for termination was retaliation for Plaintiff's protected activity of requesting disability accommodations.

213.    The pattern and timing of adverse actions following Plaintiff's protected activity demonstrates a clear causal connection between the two.

214.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for violations of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (iv) pre-judgment and post-judgment interest as calculated by law; and (v) any further legal and equitable relief as this Court may deem just and proper.

## <u>COUNT VIII</u>
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

215.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

216.    Plaintiff's termination on July 3, 2025, was wrongful and in violation of public policy as established by the FMLA and the ADA.

217.    As set forth in detail above, Plaintiff took FMLA leave from March 2025 through April 2, 2025, for a serious health condition, which is a protected right under federal law.

218.    As set forth in detail above, Plaintiff requested reasonable accommodations for her Disabilities and opposed disability discrimination, which are protected rights under federal law.

219.    Defendant terminated Plaintiff's employment in retaliation for exercising these protected rights and as a result of disability discrimination.

220.    The stated reason for termination—that Plaintiff missed a conference session following a bomb threat—was pretextual.

221.    This is evidenced by the fact that four colleagues made the exact same decision to miss the morning session and were not disciplined in any manner, demonstrating that the real reasons for termination were Plaintiff's exercise of FMLA rights and her requests for disability accommodations.

222.    The termination occurred just three months after Plaintiff's return from FMLA leave and followed a clear pattern of retaliatory and discriminatory conduct including a restrictive work plan, disparate heightened scrutiny, and hostile treatment.

223.    Defendant's termination of Plaintiff violates the clear public policy embodied in the FMLA and the ADA, which protect employees' rights to take medical leave and receive reasonable accommodations for disabilities.

224.    As a direct and proximate result of Defendant's wrongful termination, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and

humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Amanda DiGregory, seeks a judgment against Defendant, U.S. House of Representatives, Office of Congressman Chris Deluzio, for wrongful termination in violation of public policy and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay and front pay; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (iv) pre-judgment and post-judgment interest as calculated by law; and (v) any further legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

225.    Plaintiff requests a trial by jury on all matters so triable.

Date:  January 6, 2026

Respectfully submitted,


**THE WORKERS' RIGHTS LAW GROUP, LLP**

By: */s/ Brendan K. Petrick*
   Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
   */s/ Patrick W. Carothers*
   Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)
   */s/ Garret A. Hampton*
   Garret A. Hampton, Esq. (Pa. I.D. No. 338635)

   The Workers' Rights Law Group, LLP
   Foster Plaza 10
   680 Andersen Drive, Suite 230
   Pittsburgh, PA 15220
   Telephone: 412.910.9592
   Facsimile: 412.910.7510
   brendan@workersrightslawgroup.com
   patrick@workersrightslawgroup.com
   garret@workersrightslawgroup.com

   *Counsel for Plaintiff, Amanda DiGregory*